United States District Court
Southern District of Texas
**ENTERED**
September 12, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | CRIMINAL ACTION NO. H-17-567-1 |
| | § | |
| RONALD DONNELL BROWN, | § | |
| | § | |
| Defendant. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Pending before the court are Defendant Brown's Sealed Supplemental Motion for Evidentiary Hearing on Taint from Attorney-Client Privilege Breach ("Motion for Evidentiary Hearing") (Docket Entry No. 280). For the reasons stated below, Brown's Motion for Evidentiary Hearing will be denied.

## I. <u>Background</u>

### A. Factual Background[1]

In the early morning hours of Saturday, August 3, 2013, a Harris County Sheriff's Office ("HCSO" marked unit working with federal agents from the Department of Homeland Security

---

[1]This section derives from the Factual Summary in Brown's previously filed <u>Weatherford v. Bursey</u> Motion to Suppress Evidence and Motion for Evidentiary Hearing on Taint ("Brown's Initial Motion for Evidentiary Hearing"), Docket Entry No. 255, pp. 1-3, and exhibits attached thereto, and from Notes of FBI interviews of Yahaira Diaz conducted on July 14 and 28, 2023, Exhibit 1 to United States' Surreply Concerning Defense's Surresponse to the United States' Reply to <u>Weatherford v. Bursey</u> Motion to Suppress Evidence and Motion for Evidentiary Hearing on Taint ("Government's Surreply"), Docket Entry No. 287-1. Page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

Investigations ("HSI") initiated a traffic stop of a vehicle driven by Jeffrey Hughes in Baytown, Texas. A subsequent consensual search of the vehicle revealed a suitcase containing $718,407.00 in United States currency. Hughes admitted that he had been paid $50,000.00 to transport the currency, but did not identify who paid him or who owned the currency. Law enforcement seized the currency.

In 2013 Yahaira Diaz ("Diaz") owned a Houston based tax service and was looking for investors to help her open a school in the area of Stafford, Texas. The husband of one of Diaz' clients introduced her to Brown, who told her that he liked the idea of investing in the school. Shortly thereafter on Sunday August 4, 2013, Brown called Diaz and asked her to attend a meeting with him at the office of his attorney, Chip Lewis ("Lewis"). Although Diaz found the request a bit strange, she agreed thinking that the meeting would be about paper work needed for an investment in her school. The meeting was attended by Diaz, Brown, Lewis, and another attorney, Alicia O'Neil ("O'Neil"). A discussion ensued about money, but not about an investment in Diaz' school. Diaz soon realized that the money being discussed was almost a million dollars derived from some illegal activity that law enforcement had seized the previous day from a driver working for Brown. During the meeting Brown called the driver from his cell phone and placed the call on speaker so that the meeting attendees could all hear the conversation. The driver described the traffic stop, the

2

consensual search of his vehicle, discovery of the suitcase containing the currency, and law enforcement's seizure of the currency. Lewis assured the driver that he, i.e., Lewis, would represent him as his attorney. Brown called the driver "Black," who is believed to be Government Witness # 4, Jeffrey Hughes ("Hughes"). Brown and Lewis then began discussing how Diaz could claim the currency as hers in exchange for which Brown could give Diaz a percentage of the amount as an investment in her school. Lewis asked Diaz for her contact information and told her that an attorney would be contacting her about petitioning for the currency.

On Monday, August 5, 2013, Diaz contacted F.B.I. agent Shauna Dunlap for whom she had previously done some work, and Agent Dunlap put Diaz in contact with two other agents who introduced her to HSI Special Agent Perzigian ("Perzigian").

On September 9, 2013, Diaz met with Perzigian and FBI Houston Special Agent Jack Walker ("Walker"), and described to them the August 4, 2013, meeting with Brown, Lewis, and O'Neil. Diaz also told Agents Perzigian and Walker that Brown routinely spoke to her about his drug business, stating that he traveled weekly to Atlanta, Georgia, to facilitate his drug business, he dealt in multi-kilogram amounts of cocaine and marijuana, and "Black" was not the only driver who worked for him.[2]

---

[2]See HSI Offense Reports, Exhibit 1 to Sealed Exhibits to Motion, Docket Entry No. 257-1, pp. 14-16.

On September 10, 2013, Diaz met with O'Neil and signed a statement of intent to petition for the $718,407.00.[3]

The first recorded meeting occurred on September 12, 2013, when Diaz met with O'Neil in O'Neil's office.  O'Neil explained to Diaz that no attorney could represent her in trying to claim someone else's money, that Diaz would need to show how or why Hughes had the money that Diaz claimed belonged to her, and that Diaz would need to provide financial documentation to prove that the money belonged to her.[4]

The second recorded meeting occurred on September 16, 2013, when Diaz met with Brown at Brown's residence.  During this meeting Brown and Diaz arranged to meet with O'Neil at her office the next afternoon.  Brown then described to Diaz how he had been kidnaped in Atlanta a few days earlier.  Brown also described some aspects of his illegal drug business, for example that he gets a "brick," i.e., one kilogram of cocaine for $28,000.00, that he makes $3,500.00 profit per brick, and that he makes money when dealing in amounts of 30 to 40 bricks.[5]

---

[3]Id. at 16.

[4]Id.

[5]See United States' Reply Concerning Defense's Weatherford v. Bursey Motion to Suppress Evidence and Motion for Evidentiary Hearing on Taint ("Government's Response"), Docket Entry No. 272, pp. 5-6 (citing Exhibit 2, Transcript of September 16, 2013, conversation between Brown and Diaz, Docket Entry No. 272-2).

4

The third recorded meeting occurred on September 17, 2013, when Diaz met with O'Neil, Brown, and Lewis at Lewis' office. During that meeting Lewis cautioned Diaz and Brown that federal agencies would investigate the authenticity of any information provided as justification for a petition claiming the money, that Diaz could be deposed under oath and subject to criminal penalties for perjury, and that if the answers she would give did not sound like answers she wanted to make under oath, she could decline.[6]

On October 16, 2013, the Government sought and received an Ex Parte Order that the crime-fraud exception applied to certain communications that were recorded by Diaz.[7]   Analysis of the recordings caused the Department of Justice to decline charges against Lewis and O'Neil, following which HSI Houston opened an investigation into Brown.[8]

---

[6]Id. at 6-7 (citing Exhibits 2 and 2A to Sealed Exhibits to Motion, Docket Entry Nos. 257-2 (recording of 9/17/2013 attorney-client meeting), and 257-3 (transcript of recording of attorney-client meeting)).

[7]Id. at 8 (citing Exhibit 4, Order signed October 16, 2013, in H-13-1026M, Docket Entry No. 272-4).  See also Ex Parte Motion for an Order That the Crime-Fraud Exception Applies to Certain Communications in Furtherance of a Crime, and Order granting that motion, entered in H-13-mj-1026 on October 16, 2013, Docket Entry No. 287-3.   The Ex Parte Order was based on the Affidavit of HSI Special Agent Perzigian ("Perzigian Affidavit"), which appears in the record as Docket Entry Nos. 272-1 and 287-2.

[8]Brown's Initial Motion for Evidentiary Hearing, Docket Entry No. 255, pp. 2-3 (citing HSI Offense Reports, Exhibit 1 to Sealed Exhibits to Motion, Docket Entry No. 257-1, p. 4).

**B.    Procedural Background**

On June 22, 2022, Defendant Brown filed his Initial Motion for Evidentiary Hearing on Taint (Docket Entry No. 255).   Asserting that federal agents acting through an informant violated Brown's Fifth Amendment rights by intruding on privileged attorney-client communications without obtaining court authorization, Brown's motion sought an evidentiary hearing.    Following a brief hearing held on April 20, 2023, the court denied Brown's motion without prejudice, stating that Brown could file a subsequent motion after the Government filed their exhibit and witness lists.[9]   On May 5, 2023, the Government filed an Exhibit List (Docket Entry No. 276), and a Sealed Witness List (Docket Entry No. 277).  On July 7, 2023, Brown   filed   the   pending   Motion   for   Evidentiary   Hearing "incorporat[ing]   all   law   and   arguments   previously   outlined."[10] Brown argues that

> Government witness #1 Perzigian through Government witness #7 Yahaira Diaz, and Government Exhibits #1-6 are "fruit of the poisonous tree" of Fifth Amendment attorney-client privilege breaches . . . Because Brown disclosed privileged information to his counsel, which was communicated to government agents by their informant Yahaira Diaz on at least two occasions, and once at their express direction, prejudice is established.[11]

_____

[9]Minutes for Hearing Held on April 20, 2023, Docket Entry No. 275.

[10]Motion for Evidentiary Hearing, Docket Entry No. 280, p. 2 ¶ 2.

[11]Id. at 1.  See also id. at 3 ¶¶ 6-7, and Brown's Surreply, Docket Entry No. 286, pp. 6-7.

On August 4, 2023, the Government filed United States' Reply Concerning Defense's Supplemental <u>Weatherford v. Bursey</u> Motion to Suppress Evidence and Motion for Evidentiary Hearing on Taint ("Government's Reply") (Docket Entry No. 285), urging the court to

> find that there was no violation of Brown's Fifth or Sixth Amendment rights, and find that no taint exists for two reasons: (1) The communications reported and recorded by a Confidential Source were not privileged; and (2) Assuming that the communications were privileged, the Defendant cannot show prejudice.[12]

On August 14, 2023, Brown filed Defendant Brown's Sur Reply to Government's Reply Concerning Brown's <u>Weatherford v. Bursey</u> Motion to Suppress Evidence ("Brown's Surreply")(Docket Entry No. 286).Asserting that "the Government, through their confidential source, obtained Brown's admissions of <u>past criminal conduct,</u> which he disclosed to this attorney, specifically that Brown engaged in past drug dealing that produced narcotics proceeds which the Government then seized,"[13] Brown argued that "[t]he Fifth Amendment protects past criminal conduct disclosed to any attorney to obtain legal advice."[14]

On August 21, 2023, the Government filed a Surreply arguing that "Brown effectively waived any privilege by inviting a disinterested third party to a meeting [with] his attorney."[15]

---

[12]Government's Reply, Docket Entry No. 285, p. 1.

[13]Brown's Surreply, Docket Entry No. 286, p. 1.

[14]<u>Id.</u>

[15]Government's Surreply, Docket Entry No. 287, p. 8.

7

## II. Analysis

Asserting that "[o]n August 4, 2013, the first non-recorded Fifth Amendment attorney-client breach occurred,"[16] Brown argues that

> the attorney-client privileged information breach was engaged in by the government informant Yahaira Diaz when she shared information obtained from Brown's privileged attorney-client communications with Attorney 1[, i.e., Lewis], with the government before obtaining a court order as required by [United States v.] Zolin, [109 S. Ct. 2619 (1989)].[17]

Asserting that

> [o]n September 17, 2013, a second breach of Fifth Amendment attorney-client privilege occurred, when a second attorney client meeting between Brown and Attorney 1[, i.e., Lewis,] and Attorney 2[, i.e., O'Neil,] was recorded by the informant Diaz at government direction, also without first obtaining a court order required by Zolin.[18]

Asserting that "[i]nformation obtained in violation of Fifth Amendment attorney-client privilege was used to open and develop the investigation into Brown,"[19]

> Brown seeks discovery and an evidentiary hearing where he may cross-examine Government Witnesses #1, #2, #3, and #7 to determine whether 'fruit of the poisonous tree' taint derived from the Fifth Amendment attorney-client privilege breach by Yahaira Diaz exists.[20]

---

[16] Motion for Evidentiary Hearing, Docket Entry No. 280, p. 2 ¶ 3.

[17] Id.

[18] Id. ¶ 4.

[19] Id. at 3 ¶ 8.

[20] Id. ¶ 9.

8

Brown "seeks suppression at his trial of Government Exhs. 1-6, and the testimony of Government Witnesses #1-7,"[21] and "also seeks discovery of all communications and memoranda of agents who received Fifth Amendment privileged attorney-client communications between Brown and his counsel provided by informant Yahaira Diaz."[22]

## A.   Brown Fails to Show that the Communications at Issue Were Protected by the Attorney-Client Privilege

### 1.   Applicable Law

"Confidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged." Fisher v. United States, 96 S. Ct. 1569, 1577 (1976).  "The purpose of the privilege is to encourage clients to make full disclosure to their attorneys." Id.  The attorney-client privilege prevents disclosure of confidential communications by a client to his attorney while seeking legal advice.  See United States v. Pipkins, 528 F.2d 559, 562 (5th Cir. 1976), cert. denied, 96 S. Ct. 3177 (1976).  The privilege does not protect "everything that arises out of the existence of an attorney-client relationship." Id. at 563.  For a communication to be protected under attorney-client privilege, the proponent "must prove: (1) that he made a confidential communication; (2) to a lawyer or his subordinate; (3) for the

---

[21]Id. at 4 ¶ 10.

[22]Id. ¶ 11.

9

primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding." United States v. Robinson, 121 F.3d 971, 974 (5th Cir. 1997), cert. denied, 118 S. Ct. 731 (1998).  See also Equal Employment Opportunity Commission v. BDO USA, L.L.P., 876 F.3d 690, 695 (5th Cir. 2017) (same).  The privilege is to be strictly construed and requires evidence of an intent that the communication remain confidential. See Pipkins, 528 F.2d at 563.  See also In re Auclair, 961 F.2d 65, 69 (5th Cir. 1992) ("[T]he privilege protects only confidential communications. . . ").

A communication that would otherwise be privileged loses its protection if it is shared with a third party who does not have a common legal interest with the client.  In re Auclair, 961 F.2d at 69 ("Because the privilege protects only confidential communications, the presence of a third person . . . eliminates the intent for confidentiality on which the privilege rests.").  See also Pipkins, 528 F.2d at 563 ("[C]ourts have refused to apply the privilege . . . to communications made in the presence of third parties.").  "Disclosure of any significant portion of a confidential communication waives the privilege as to the whole." Nguyen v. Excel Corp., 197 F.3d 200, 208 (5th Cir. 1999).  This general principle has applied to circumstances in which the holder of the privilege voluntarily discusses privileged communications with a third party or selectively discloses privileged information

for its tactical benefit.  For example, in <u>United States v. El Paso Co.</u>, 682 F.2d 530, 539-42 (5th Cir. 1982), <u>cert. denied,</u> 104 S. Ct. 1927 (1984), the Fifth Circuit found that a taxpayer corporation had waived its attorney client privilege relating to a tax pool analysis by disclosing the information to accountants, despite the fact that the attorneys and accountants worked in conjunction on the tax returns.  The Fifth Circuit found that the taxpayer corporation had waived its privilege as to the whole subject matter of the communication.

The common interest or joint defense privilege is an exception to the general rule that no privilege attaches to communications that are made in the presence of or disclosed to a third party.  <u>In re Auclair,</u> 961 F.2d at 69-71 (holding that the joint defense or common interest privilege preserved the attorney-client privilege against waiver in the context of a group with common legal interests).  The common interest exception applies to co-defendants or potential co-defendants and their counsel.  <u>See In re Santa Fe International Corp.,</u> 272 F.3d 705, 710 (5th Cir. 2001).  The Fifth Circuit requires there to be some "palpable threat of litigation at the time of the communication" in order for the common legal interest extension of the attorney-client privilege to apply.  <u>Id.</u> at 711.

"[A]pplication of the attorney-client privilege is a 'question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents.'"  <u>United States v.</u>

11

<u>Murra,</u> 879 F.3d 669, 681 (5th Cir.), <u>cert. denied,</u> 139 S. Ct. 94 (2018) (quoting <u>In re Auclair,</u> 961 F.2d at 68). "Ambiguities as to whether the elements of a privilege claim have been met are construed against the proponent." <u>BDO USA,</u> 876 F.3d at 695.

### 2. Application of the Law to the Facts

Brown argues that he disclosed privileged information to his counsel at meetings that Diaz attended with Brown and attorneys Lewis and O'Neil on August 4, 2013, and September 17, 2013.[23] Brown argues that "the Government, through their confidential source, [Diaz,] obtained Brown's admissions of <u>past criminal conduct,</u> which he disclosed to his attorney, specifically that Brown engaged in past drug dealing that produced narcotics proceeds which the Government seized."[24]

### (a) August 4, 2013, Meeting

Brown argues that

[o]n August 4, 2013, the first non-recorded Fifth Amendment attorney-client breach occurred, when the informant Diaz communicated Fifth Amendment attorney-client privileged information between Brown and Attorney 1 [<u>i.e.,</u> Lewis,] to the government in September 2013.[25]

---

[23]<u>Id.</u> at 1-2 ¶¶ 3-4.

[24]Brown's Surreply, Docket Entry No. 286, p. 1.

[25]Motion for Evidentiary Hearing, Docket Entry No. 280, p. 2 ¶ 3.

Brown argues that

> [t]he attorney-client privileged information breach was
> engaged in by government informant . . . Diaz when she
> shared information obtained from Brown's privileged
> attorney-client communications with Attorney 1 [i.e.,
> Lewis,] with the government, before obtaining a court
> order as required by Zolin[, 109 S. Ct. at 2625].[26]

As evidence of the attorney-client breaches Brown cites HSI Offense

Reports attached to his original motion.[27]

Missing from Brown's briefing is argument or citations to any

evidence showing that the August 4, 2013, communication about which

he complains, i.e., that he engaged in past drug dealing that

produced narcotics proceeds seized by the government, is a

communication protected by attorney-client privilege.   Instead,

Brown merely asserts that because this communication was made in

the presence of two attorneys, Lewis and O'Neil, that it is

privileged, and that its communication to federal agents by Diaz

violated rights guaranteed by the Fifth and Sixth Amendments to the

United States Constitution.   But the attorney-client privilege does

not protect "everything that arises out of the existence of an

attorney-client relationship." Pipkins, 528 F.2d at 563.   For a

communication to be protected under the attorney-client privilege,

the proponent "must prove: (1) that he made a confidential

communication; (2) to a lawyer or his subordinate; (3) for the

---

[26]Id.

[27]Id. (citing HSI Offense Reports, Exhibit 1 to Sealed Exhibits
to Motion, Docket Entry No. 257-1).

13

primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding." Robinson, 121 F.3d at 974. See also BDO USA, 876 F.3d at 695 (same).

In his original motion Brown neither argued nor cited any evidence showing that the August 4, 2013, disclosure that he engaged in past drug dealing that produced narcotics proceeds which the government seized, was a confidential communication. To the contrary, the HSI offense reports which Brown cites in support of his argument reflects that Brown asked Diaz to accompany him to the meeting because he, i.e., Brown, had business to discuss with Lewis, not because he and Diaz both had business to discuss with Lewis.[28] A communication that would otherwise be privileged loses its protection if it is shared with a third party who does not have a common legal interest with the client. See In re Auclair, 961 F.2d at 69 ("Because the privilege protects only confidential communication, the presence of a third person . . . eliminates the intent for confidentiality on which the privilege rests.").

In his original motion Brown describes both the August 4, 2013, and the September 17, 2013, meetings as "centered around the money seized and Brown's attempt to reclaim the money."[29]  Brown neither argued nor cited any evidence showing that he and Diaz

---

[28]See HSI Offense Reports, Exhibit 1 to Sealed Exhibits to Motion, Docket Entry No. 257-1, p. 14.

[29]Brown's Initial Motion for Evidentiary Hearing, Docket Entry No. 255, p. 2.

14

shared a common legal interest in the seized money. Nevertheless, in reply to the government's response that Brown could not assert attorney-client privilege for disclosures made during the August 4, 2013, meeting because he could not reasonably have expected those communications to be confidential,[30] Brown argued that the common interest attorney-client privilege applies to this case.[31] In support of that argument Brown quotes the following passage from In re Auclair:

> [W]hen more than one person seeks consultation with an attorney on a matter of common interest, the parties and the attorney may reasonably presume that the parties are seeking representation of a common or joint matter. In United States v. Melvin, 650 F.2d 641, 645 (5th Cir. Unit B. 1981), we held that a "communication is protected by the attorney-client privilege . . . if it is intended to remain confidential and was made under such circumstances that it was reasonably expected and understood to be confidential." We therefore now hold that absent a contrary expression of intention by one of the parties, the existence of a matter of common interest must be presumed in the pre-representation phase as presented in the case at bar. To hold otherwise would present a conundrum whose only acceptable resolution would be that a lawyer may never meet with more than one potential client for fear that the attorney-client privilege would be destroyed as to all.

861 F.2d at 70.

Asserting that "[a]ccording to the government response, the affidavit and case report of agent Perzigian, [Diaz] never

---

[30]Government's Response, Docket Entry No. 272, pp. 16-17.

[31]Defendant Brown's Response to United States' Reply to Defendant's Weatherford v. Bursey Motion, Docket Entry No. 274, pp. 1-4.

expressed in any form to Brown or the attorneys that [she] did not want to be part of this common legal representation," Brown argues that "absent such a contrary expression of intention by one of the parties, the existence of a matter of common interest must be presumed."[32]   Quoting In re Auclair, 861 F.2d at 70, Brown argues that because Diaz

> decided to accept a lawyer that was working jointly with Brown's lawyer, signed a representation agreement that was submitted to the Department of Homeland Security, . . . and later attended the September 17, 2013, counsel meeting with both lawyers and Brown. . . . Brown and the attorneys . . . reasonably viewed [Diaz] as part of the legal team; therefore, their "communication is protected by the attorney-client privilege . . . [because] it is intended to remain confidential and was made under such circumstances that it was reasonably expected and understood to be confidential."[33]

The flaw in Brown's reasoning is that the actions he argues show that he and his attorneys reasonably viewed Diaz as part of their legal team occurred in September of 2013, more than a month after the August 4, 2013, meeting.   Brown fails to cite any evidence indicating that he and Diaz shared a common legal interest in the seized money on August 4, 2013, or that during the meeting that occurred on that day Brown or his attorneys had any reason to believe that Diaz was then or would in the future share a common legal interest in the seized money.   The facts of this case are therefore distinguishable from those at issue in In re Auclair.

---

[32]Id. at 4 (citing Affidavit of HSI Special Agent Perzigian, p. 5 ¶ 9, Docket Entry Nos. 272-1 and 287-2).

[33]Id.

In re Auclair dealt with the situation where multiple potential clients "consult an attorney together as a group with common interests seeking common representation." 961 F.2d at 69. The court held that, in that situation, potential clients do not waive the attorney-client privilege because of the presence of the other prospective clients. Id. at 70-71. This holding does not change the general rule that waiver results from disclosure to third parties who do not have a common legal interest. In re Auclair simply extended the joint defense privilege to the pre-representation stage. Brown has stated that the August 4, 2013, meeting was "centered around the money seized and Brown's attempt to reclaim the money."[34] Brown does not (and could not seriously) contend that Diaz shared a common legal interest in the money seized, or that the August 4, 2013, meeting was a consultation with attorneys at which he and Diaz sought common representation for a matter of common legal interest.

The fact that Brown and Diaz did not share a common legal interest in the subject of the August 4, 2013, meeting, i.e., the money seized and Brown's attempt to reclaim it, is amply evidenced in the record. The day after the August 4, 2013, meeting Diaz contacted FBI Special Agent Shauna Dunlap, with whom she had previously worked, to report that Brown owned the $787,407.00 seized on August 3, 2013. Shortly after contacting Special Agent

---

[34]Brown's Initial Motion for Evidentiary Hearing, Docket Entry No. 255, p. 2.

Dunlap, Diaz met with two other FBI agents who, in turn, put her in contact with HSI Special Agent Perzigian. On September 9, 2013, Diaz met with HSI Special Agent Perzigian and FBI Special Agent Walker, at which time Diaz not only described the August 4, 2013, meeting but also told them that Brown routinely spoke to her about his drug business. Diaz stated that Brown traveled weekly to Atlanta, Georgia, to facilitate his drug business, which dealt in multi-kilogram amounts of cocaine and marijuana, and that "Black," the driver from whom the money was seized on August 3, 2013, was not the only driver who worked for him.[35] The lack of common legal interest in the money seized on August 3, 2013, is also evidenced by interviews of Diaz conducted by FBI Special Agent Brian Ritchie and Assistant United States Attorneys Sebastian Edwards and Britni Cooper on July 14 and 28, 2023. The notes from those interviews show that Brown lured Diaz to the August 4, 2013, meeting under the pretense that he was interested in investing in a school that Diaz was trying to open and that the discussion with Lewis would be about paperwork for such an investment.[36]

The lack of common interest in the seized money is also evidenced by the fact that Diaz did not take any of the actions that Brown argues led him and his attorneys to believe that she was

---

[35]See HSI Offense Reports, Exhibit 1 to Sealed Exhibits to Motion, Docket Entry No. 257-1, pp. 14-16.

[36]See Notes of FBI interviews of Yahaira Diaz conducted on July 14 and 28, 2023, Exhibit 1 to Government's Surreply, Docket Entry No. 287-1.

part their legal team until after she met with Special Agents Perzigian and Walker on September 9, 2013. Brown argues that he and his attorneys believed that Diaz was part of their legal team because Diaz "decided to accept a lawyer that was working jointly with Brown's lawyer, [and] signed a representation agreement that was submitted to the Department of Homeland Security, and later attended the September 17, 2013, counsel meeting with both lawyers and Brown."[37] But Diaz did not take these actions until September 10, 2013, the day after she met with Special Agents Perzigian and Walker.[38] Accordingly, these actions could not have lead Brown to believe that disclosures made in Diaz' presence on August 4, 2013, were confidential or intended to remain confidential.

Because Brown has failed to cite any evidence showing that he and Diaz shared a common legal interest in either Brown's drug business or the money seized from Brown's driver, "Black," i.e., Hughes, on August 3, 2013, disclosures that Brown made during the meeting that he had with Diaz and attorneys Lewis and O'Neil on August 4, 2013, were not confidential and, therefore, not protected by the attorney-client privilege. Because any disclosure of past criminal conduct that Brown made during the August 4, 2013, meeting

---

[37]Defendant Brown's Response to the United States' Reply to Defendant's Weatherford v. Bursey Motion, Docket Entry No. 274, p. 4.

[38]See HSI Offense Reports, Exhibit 1 to Sealed Exhibits to Motion, Docket Entry No. 257-1, p. 16. See also (Affidavit of HSI Special Agent Perzigian, p. 5 ¶ 9, Docket Entry Nos. 272-1 and 287-2).

was neither confidential nor protected by the attorney-client privilege, Diaz's communication of disclosures that Brown made during that meeting to government agents on September 9, 2013, did not violate Brown's Constitutional rights.

        (b)   September 17, 2013, Meeting

Brown argues that

> [o]n September 17, 2013, a second breach of Fifth Amendment attorney-client privilege occurred, when a second attorney client meeting between Brown and Attorney 1 [i.e., Lewis,] and Attorney 2 [i.e., O'Neil,] was recorded by the informant Diaz at government direction, also without first obtaining a court order required by Zolin.[39]

Although Brown argues that "the Government, through their confidential source [Diaz], obtained Brown's admissions of past criminal conduct, which he disclosed to his attorney, specifically that Brown engaged in past drug dealing that produced narcotics proceeds which the Government seized,"[40] Brown fails to cite any part of the transcript of the September 17, 2013, meeting in support of his argument that disclosure of past criminal conduct was made during the meeting with attorneys Lewis and O'Neil. The transcript of the September 17, 2013, meeting reflects that the only discussion of Brown's criminal conduct occurred during a private conversation between Brown and Diaz after the meeting with

---

[39]Motion for Evidentiary Hearing, Docket Entry No. 280, p. 2 ¶ 4.

[40]Brown's Surreply, Docket Entry No. 286, p. 1.

attorneys Lewis and O'Neil had ended. In other words, there is no evidence in the transcript of the September 17, 2013, meeting that Brown's past criminal conduct was disclosed in the presence of attorneys Lewis or O'Neil.[41] Accordingly, the court concludes that Diaz' recording of the September 17, 2013, meeting is not a source of the information that Brown argues breached the attorney-client privilege and violated his Constitutional rights.

**B. Brown Fails to Establish a Claim Under Weatherford v. Bursey**

Asserting that the government knowingly intruded into his attorney-client communications without a court order, and that by so doing obtained privileged information regarding past criminal conduct the government had no legal authority to obtain, Brown seeks to suppress all evidence obtained as a result of that intrusion. For the reasons stated in the preceding § II.A the court has already concluded that the communications that Brown argues were knowingly intruded upon by the government were not protected by the attorney-client privilege. Nevertheless, for the reasons stated below the court concludes that even if disclosures Brown made at meetings with attorneys Lewis and O'Neil held on August 4 and September 17, 2013, were protected by the attorney-client privilege, Brown fails to show entitlement to relief under Weatherford v. Bursey, 97 S. Ct. 837 (1977).

---

[41]See Transcript, Exhibit 2A to Sealed Exhibits to Motion, Docket Entry No. 257-3.

1.   <u>Applicable Law</u>

In <u>Weatherford,</u> 97 S. Ct. at 841, the Supreme Court rejected a <u>per se</u> rule that any governmental intrusion into privileged attorney-client conversations violates the Sixth Amendment. Instead, the Court considered a number of factors to determine whether a criminal defendant's rights were violated by the Government's intrusion.   These factors include: (1) whether the presence of the informant was purposely caused by the government in order to garner confidential, privileged information, or whether the presence of the informant was the result of other inadvertent occurrences; (2) whether the government obtained, directly or indirectly, any evidence which was used at trial as the result of the informant's intrusion; (3) whether any information gained by the informant's intrusion was used in any other manner to the substantial detriment of the defendant; and 4) whether details about trial preparations were learned by the government.   <u>Id.</u> at 843.   Thus, even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is warranted.   <u>See United States v. Morrison,</u> 101 S. Ct. 665, 668-69 (1981).   <u>See also United States v. Steele,</u> 727 F.2d 580, 585-86 (6th Cir.), <u>cert. denied sub nom. Scarborough v. United States,</u> 104 S. Ct. 2396 (1984); <u>United States v. Brugman,</u> 655 F.2d 540, 546 (4th Cir. 1981).

Brown acknowledges the factors that courts consider when analyzing a Weatherford claim, but neither argues nor cites any evidence showing that consideration of those factors under the facts of this case required relief. Instead, Brown argues that

> [i]nformation learned by [Diaz] from attorney-client privileged communications under the common interest privilege on August 4, 2013, was provided to HSI and FBI agents on September 9, 2013. . . This information caused agents to direct [Diaz] to wear a recording device at subsequent attorney-client meetings and non-attorney client meetings, and constitute fruit derived from the initial common interest privilege meeting. Prejudice . . . occurs upon government intrusion into the attorney-client relationship, acquiring information in violation of the attorney-client privilege. . . . [A]ny information obtained by violation of common interest attorney-client privilege, or derived from the protected communications, whether incriminating or not, are subject to suppression after an evidentiary hearing.[42]

### 2.    Application of the Law to the Facts

For the reasons explained below the court concludes that analysis of the Weatherford factors with respect to the August 4, 2013, and the September 17, 2013, meetings between Brown, Diaz, and attorneys Lewis and O'Neil establish that Brown has not been prejudiced by Diaz' actions. Thus Brown has failed to establish a Weatherford claim and no suppression of evidence is required.

---

[42]Defendant Brown's Response to the United States' Reply to Defendant's Weatherford v. Bursey Motion, Docket Entry No. 274, p. 7.

(a) August 4, 2013, Meeting

### (1) Presence of the Informant Was Not Purposely Caused by the Government

The government argues — and the court agrees — that the first Weatherford factor is not satisfied as to the August 4, 2013, unrecorded meeting between Brown, Diaz, and attorneys Lewis and O'Neil because Diaz did not attend that meeting at the direction of any government agent but, instead, at Brown's behest.[43] It was only after Diaz contacted federal agents to report that Brown was the true owner of the money seized on August 3, 2013, that Diaz began providing the government information about Brown and his narcotics business. Thus, Diaz' presence at the August 4, 2013, meeting was not purposely caused by the government to garner confidential, privileged information, but was, instead, the result of other inadvertent occurrences.

### (2) The Government Did Not Obtain, Directly or Indirectly, Any Evidence to be Used at Trial from the Intrusion

The government argues that Brown has not satisfied the second Weatherford factor because his case has not yet proceeded to trial, and because Brown's incriminating statements were made outside the presence of attorneys and are not relevant to the indicted

---

[43]Government's Response, Docket Entry No. 272, pp. 13-14. See also HSI Offense Reports, Exhibit 1 to Sealed Exhibits to Motion, Docket Entry No. 257-1, p. 14, and Affidavit of HSI Special Agent Perzigian, p. 3 ¶ 5, Docket Entry Nos. 272-1 and 287-2.

charges.[44]   However, Brown is seeking to suppress evidence to be used at trial that he contends resulted from the intrusion of his privileged attorney-client communications.   Brown argues that

> Government witness #1 Perzigian through Government witness #7 Yahaira Diaz, and Government Exhibits #1-6 are "fruit of the poisonous tree" of Fifth Amendment attorney-client privilege breaches . . . Because Brown disclosed privileged information to his counsel, which was communicated to government agents by their informant Yahaira Diaz on at least two occasions, and once at their express direction, prejudice is established.[45]

Government Exhibits #1-#6 all are related to the traffic stop in which money was seized from Hughes on August 3, 2013: Exhibits #1 and #2 are dashcam screen shots of the traffic stop; Exhibit #3 is the money seizure document; Exhibit #4 is the Waiver form from the traffic stop; Exhibit #5 is the consent to search form; and Exhibit 6 is dash cam video of the traffic stop.[46]   Government Witnesses #1-#7 are also all related to the August 3, 2013, traffic stop. Government Witness #1 is HSI Special Agent Perzigian, with whom Diaz met on September 9, 2013, to inform the government that Brown owned the money seized during the August 3, 2013, traffic stop. Government Witness #2 is HCSO Deputy A. Rivera, who will testify about the tip regarding 2013 money laundering.   Government Witness #3 is HCSO Deputy R. Wade, who initiated the August 3, 2013,

---

[44]Id. at 17-19.

[45]Id. at 1.   See also id. at 3 ¶¶ 6-7, and Brown's Surreply, Docket Entry No. 286, pp. 6-7.

[46]Government Exhibit List, Docket Entry No. 276.

traffic stop.  Government Witness #4 is "Black," i.e., Hughes, the driver from whom the money was seized.  Government Witness #5 is HCSO K-9 Deputy J. Bullock, the K-9 officer at the traffic stop. Government Witness #6 is HCSO Deputy R. Persuad, who will testify as to photos and evidence from the scene of the August 3, 2013, traffic stop.  Government Witness #7 is Diaz who will testify that Brown admitted to drug dealing and money laundering.[47]  Brown argues that these witnesses "will testify to matters that are 'fruit of the poisonous tree' . . . because they were derived, directly or indirectly, as witnesses against Brown from the Fifth Amendment attorney-client privilege breach that was used to open an investigation of Brown."[48]

The evidence Brown seeks to suppress is not "fruit of the poisonous tree" because while Diaz' knowledge that the money seized from Hughes on August 3, 2013, belonged to Brown originated during the August 4, 2013, meeting, Diaz did not communicate that information to government agents involved in this case until she met with Special Agents Perzigian or Walker on September 9, 2013, and by then, Brown had disclosed details about his narcotics business to Diaz outside the presence of his attorneys.  The HSI offense reports attached to Brown's original motion show that when Diaz met with Special Agents Perzigian and Walker on September 9,

---

[47]Government Witness List, Docket Entry No. 277.

[48]Motion for Evidentiary Hearing, Docket Entry No. 280, p. 3 ¶ 7.

2013, she not only described the August 4, 2013, meeting, but also told them that Brown routinely spoke to her about his drug business. Diaz told the agents that Brown told her he traveled weekly to Atlanta, Georgia to facilitate his large scale drug business, which dealt in multi-kilogram amounts of cocaine and large amounts of marijuana, and that "Black," the driver from whom money was seized on August 3, 2013, was not the only driver working for his drug business.[49] Accordingly, the court is not persuaded that the government obtained, directly or indirectly, any evidence to be used at trial from Diaz' attendance at the August 4, 2013, meeting with Brown's attorneys that was not otherwise available to her from non-attorney client meetings that occurred before she described the August 4, 2013, meeting to government agents on September 9, 2013.

### (3) Information Gained by Diaz Has Not Been Used to Brown's Detriment

Brown argues that information gained by Diaz' intrusion into his attorney-client communications has been used to his detriment because it was used to open an investigation of him in September of 2013.[50] The government argues — and the court agrees — that the 2013 investigation of Brown has not been used to Brown's detriment

---

[49]See HSI Offense Reports, Exhibit 1 to Sealed Exhibits to Motion, Docket Entry No. 257-1, p. 16.

[50]Motion for Evidentiary Hearing, Docket Entry No. 280, p. 3 ¶ 8.

because the indictment in this case did not result from the 2013 investigation but, instead, from an investigation of Brown that started in June of 2016, and proceeded on the strength of information provided to FBI Special Agents Brian Ritchie and Renee Cline during interviews of Eric Williams and Elmer Cathey, Sr.[51] Notes of the interviews with Elmer Cathey, Sr. conducted on January 18, 2017, include detailed information about Brown's narcotics business, including the fact that "Black", i.e., Hughes, worked for Brown as a driver.[52] Notes from an interview with Elmer Cathey, Sr. conducted on July 12, 2016, include information that when heading back from Atlanta "Black" was stopped in Texas and almost one million dollars of Brown's money was seized.[53] Because the indictment in this case resulted from the FBI investigation of Brown that was opened in 2016, and because interviews with Elmer Cathey, Sr. include information about the seizure of Brown's money from Hughes that occurred in 2013, Brown has failed to show that the information he argues was gained from Diaz at meetings with his attorney has been used to his detriment.

---

[51]Government's Response, Docket Entry No. 272, pp. 20-24 (citing Exhibits 7-10, FBI Electronic Communication to Open Case, Docket Entry No. 272-7; FBI Notes of Interview with Eric Williams, Docket Entry No. 272-8, and FBI Notes of Interviews with Elmer Cathey, Sr., Docket Entry Nos. 272-9 and 272-10).

[52]FBI Notes of Interview with Elmer Cathey, Sr., Docket Entry No. 272-9, p. 1.

[53]FBI notes of interview with Elmer Cathey, Sr., Docket Entry No. 272-10, p. 2.

### (4) No Details About Trial Preparations Were Learned by the Government

The government argues — and the court agrees — that no details about trial preparations were learned by the government from Diaz' attendance at the August 4, 2013, meeting with Brown and his attorneys.

### (b) September 17, 2013, Meeting

The government does not dispute that the first <u>Weatherford</u> factor is satisfied as to the September 17, 2013, recorded meeting between Brown, Diaz, and attorneys Lewis and O'Neil because Diaz attended and recorded that meeting at the direction of government agents. Nevertheless, because the court has already concluded above in § II.A.2(b) that the transcript of the September 17, 2013, meeting shows that Brown's past criminal conduct was not discussed in the presence of attorneys Lewis or O'Neil,[54] Brown cannot show that Diaz' presence at that meeting prejudiced him.  In other words, the court concludes that Brown has not shown, and cannot show that Diaz' recording of the September 17, 2023, meeting afforded the government, directly or indirectly, any evidence that will used at trial, any information that has been used to Brown's substantial detriment, or any details of trial preparations.

---

[54]<u>See</u> Transcript, Exhibit 2A to Sealed Exhibits to Motion, Docket Entry No. 257-3.

**C.   Brown Fails to Show that an Evidentiary Hearing is Needed**

Brown seeks discovery and an evidentiary hearing in order to cross-examine Government Witnesses #1 (Agent Perzigian), #2-#3 (HCSO Deputies Rivera and Wade), and #7 (Diaz).  Brown seeks to suppress at trial Government Exhibits #1-#6 and the testimony of Government Witnesses #1-#7, and seeks discovery of all communications and memoranda of agents who received Fifth Amendment privileged attorney-client communications between Brown and his counsel provided by Diaz.[55]

Under Federal Rule of Criminal Procedure 41(e), an evidentiary hearing is required on a motion to suppress only when necessary to receive evidence on an issue of fact.  United States v. Harrelson, 705 F.2d 733, 737 (5th Cir. 1983).  In Harrelson the Fifth Circuit explained that "[e]videntiary hearings are not granted as a matter of course, but are held only when the defendant alleges sufficient facts which, if proven, would justify relief."  Id.  "Factual allegations set forth in the defendant's motion, including any accompanying affidavits, must be sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented."  Id. (quoting United States v. Poe, 462 F.2d 195, 197 (5th Cir. 1972), cert. denied, 94 S. Ct. 107 (1993)).  Because Brown has failed to identify any issue of fact

---

[55]Motion for Evidentiary Hearing, Docket Entry No. 280, pp. 3-4 ¶¶ 9-11.

for which a hearing is required, and because the court concludes that the record is sufficiently developed to resolve the pending motion without an evidentiary hearing, Brown's motion for an evidentiary hearing will be denied.

### III. Conclusions and Order

For the reasons stated above in § II, Defendant Brown's Sealed Supplemental Motion for Evidentiary Hearing on Taint from Attorney-Client Privilege Breach, Docket Entry No. 280, is **DENIED**.

**SIGNED** at Houston, Texas, on this 12th day of September, 2023.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE

31