United States District Court
Southern District of Texas
**ENTERED**
October 31, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NUMBER H-17-567-01 |
| | § | |
| RONALD D. BROWN, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

On September 21, 2017, the United States ("the Government") charged Ronald Donnell Brown ("Defendant") with conspiracy to commit murder for hire, kidnapping, and other offenses.[1] On August 22, 2023, the FBI conducted a search of a residence connected to Defendant and seized items allegedly mailed from Defendant to his brother, Eric Brown, who lived at the residence. Pending before the court is Defendant Brown's Second Amended Motion to Suppress Warrantless Residence Search and Request for Hearing ("Defendant's Motion to Suppress") (Docket Entry No. 329). For the reasons stated below, Defendant's Motion to Suppress will be granted.

**I. Background**

Defendant was charged in this case on September 21, 2017, and he has been in continuous federal custody since September 28,

---

[1]Indictment, Docket Entry No. 1, pp. 5, 12-17. The live charging document is the Superseding Indictment (Docket Entry No. 130) filed on November 7, 2018. For purposes of identification all page numbers reference the pagination imprinted at the top of the page by the court's Electronic Case Filing ("ECF") system.

2017.[2]  The November 7, 2018, Superseding Indictment charges Defendant with conspiracy to commit murder for hire, intentional killing while engaged in drug trafficking, two counts of using a firearm during a crime of violence causing death by murder, kidnapping, use of a firearm during a crime of violence, and conspiracy to distribute cocaine.[3]

On or about August 22, 2023, Defendant's brother Eric Brown was killed at his home located at 9719 Bertwood Street, Houston, Texas ("the Bertwood house").[4]  Houston Police Department officers arrived at the scene and entered the house.  Federal Bureau of Investigation Special Agents Brian Ritchie and Deborah Cline ("the FBI Agents") were informed of Eric Brown's death and went to the Bertwood house later that day.[5]  They asked the lead HPD officer on the scene, Sergeant Ross Watson, for permission to enter the Bertwood house; and Watson allowed them to enter.[6]  The FBI Agents

---

[2]Id. at 19; Arrest Warrant (Executed), Docket Entry No. 30.

[3]Superseding Indictment, Docket Entry No. 130.  The Superseding Indictment included three counts of witness tampering, one count of obstructing an official proceeding, and one count of solicitation to commit murder that were dismissed by the Government in between the court's oral ruling on the pending motion and the issuance of this written order.  Id. at 17-21.

[4]Defendant's Motion to Suppress, Docket Entry No. 329, p. 1 ¶ 1; United States' Response to Defendant's Amended Motion to Suppress Residential Search ("Government's Second Response"), Docket Entry No. 320, p. 1.

[5]FD 302 (August 28, 2023), Exhibit 1 to United States' Response to Defendant's Amended Motion to Suppress Residential Search ("Government's Response"), Docket Entry No. 316-1, p. 1.

[6]Id.

asked Watson for permission to look around the house "for the purpose of finding any letters that [Defendant] may have written and sent to Eric 'Pookie' Brown to which Sergeant Watson advised it was fine and would not interfere with the integrity of the homicide investigation."[7]

Defendant filed an earlier version of the Motion to Suppress on October 18, 2023, and the parties have filed several rounds of briefing.[8] The court held an evidentiary hearing on Defendant's Motion to Suppress on October 20, 2023.[9] Special Agent Cline testified that upon receiving HPD Officer Watson's permission, she "went through the entire house."[10] The FBI Agents seized "some discovery that was on the table from our investigation with witness statements," which included a letter from Defendant addressed to Eric Brown along with a "Hemisphere" PowerPoint presentation and witness interviews.[11] The FBI Agents seized more letters addressed to Eric Brown from Defendant that they found inside a dresser in

---

[7] Id. at 1-2.

[8] Defendant Brown's Motion to Suppress Warrantless Residence Search and Request for Hearing, Docket Entry No. 314; Government's Response, Docket Entry No. 316; Defendant Brown's Amended Motion to Suppress Warrantless Residence Search and Request for Hearing, Docket Entry No. 319; Government's Second Response, Docket Entry No. 320; United States' Additional Briefing -- Defendant's Amended Motion to Suppress Residential Search, Docket Entry No. 322; Defendant's Motion to Suppress, Docket Entry No. 329.

[9] Hearing Minutes and Order, Docket Entry No. 321.

[10] Transcript of Hearing Held on October 20, 2023, p. 5 line 20.

[11] Id. lines 10-12 and p. 7 lines 1-2.

the garage.[12]  Cline testified that she found two IDs of Eric Brown in a master bedroom and his toothbrush in the attached bathroom.[13]

Cline testified regarding Defendant's place of residence before his 2017 arrest.  She testified that she was "not sure.  We had information that he did reside at [the Bertwood house], but we also knew he had the apartment on top of Kirby as well as the ranch."[14]  Cline testified that Defendant was connected to several other properties that he was known to stay at for a few days at a time.[15]

Reginald Gould, Defendant's cousin, testified about the Defendant's place of residence.  Gould testified that Defendant grew up living at the Bertwood house, that Gould lived there with Defendant for a time as a child, that he has visited Defendant and Eric Brown there frequently since then, and that Defendant lived there leading up to his 2017 arrest.[16]  Gould identified Defendant's clothing in photos taken inside one of the master bedrooms (Gould stated that the house has four bedrooms including two master bedrooms).[17]  Gould testified that his extended family considers the house to be a family house, but that it was predominantly occupied

---

[12] Id. at 7 lines 4-6.

[13] Id. at 5 lines 22-24.

[14] Id. at 18 lines 22-24.

[15] Id. at 22-25 and pp. 19-22.

[16] Id. at 26-29.

[17] Id. at 29-30.

by Defendant and Eric Brown.[18]  Gould testified that Defendant was expected to return to the Bertwood house if he is ever released from custody and that Eric Brown had no objection to Defendant's doing so.[19]

Gould testified that Eric Brown paid the utilities, and Harris County Appraisal District records from before the search list Eric Brown as the owner of the Bertwood house.[20]

## II. Legal Standard

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . ." U.S. Const. amend. 4. To enforce the Fourth Amendment, the courts apply "the exclusionary rule," which "bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." Davis v. United States, 131 S. Ct. 2419, 2423 (2011). But "a person must have a cognizable Fourth Amendment interest in the place searched before" seeking exclusion, a requirement often referred to as Fourth Amendment "standing." Byrd v. United States, 138 S. Ct. 1518, 1530 (2018).

---

[18] Id. at 32 lines 11-14.

[19] Id. lines 15-20.

[20] Id. at 33 lines 4-10; Harris County Appraisal District Real Property Account Information, Exhibit 3 to Government's Response, Docket Entry No. 316-3.

"To establish standing to 'contest the validity of a search under the Fourth Amendment,' the defendant must prove that he has a 'reasonable expectation of privacy'" in the place searched. United States v. Gomez, 276 F.3d 694, 696-97 (5th Cir. 2001) (quoting United States v. Cardoza-Hinojosa, 140 F.3d 610, 614 (5th Cir. 1998)). "[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Payton v. New York, 100 S. Ct. 1371, 1379-80 (1980) (quoting United States v. United States District Court for the Eastern District of Michigan, 92 S. Ct. 2125, 2134 (1972)). This is not limited to a house legally owned by a defendant. See Rakas v. Illinois, 99 S. Ct. 421, 430 n.12 (1978); United States v. Salvucci, 100 S. Ct. 2547, 2553 (1980) ("While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of (the) inquiry.") (internal citation omitted).[21] "Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was

---

[21] A defendant may challenge an unlawful search of his home even if he does not pay rent. See United States v. Corral, 339 F. Supp. 2d 781, 788-89 (W.D. Tex. 2004).

legitimately on the premises." <u>United States v. Haydel</u>, 649 F.2d 1152, 1155 (5th Cir. 1981). A defendant being taken into custody does not lessen his privacy interest in his home. <u>See Mincey v. Arizona</u>, 98 S. Ct. 2408, 2413 (1978).

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." <u>Payton</u>, 100 S. Ct. at 1380. The warrant requirement is "'subject only to a few specifically established and well-delineated exceptions.'" <u>City of Los Angeles, California v. Patel</u>, 135 S. Ct. 2443, 2452 (2015) (quoting <u>Arizona v. Gant</u>, 129 S. Ct. 1710 (2009)). There is no general "murder scene exception." <u>Mincey</u>, 98 S. Ct. at 2415; <u>Flippo v. West Virginia</u>, 120 S. Ct. 7, 8 (1999). "[W]hen the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." <u>Mincey</u>, 98 S. Ct. at 2413. Those officers may even "seize any evidence that is in plain view during the course of their legitimate emergency activities." <u>Id.</u> But like all other warrantless searches, this initial sweep "must be 'strictly circumscribed by the exigencies which justify its initiation.'" <u>Id.</u> (quoting <u>Terry v. Ohio</u>, 88 S. Ct. 1868, 1882 (1968)).

A warrant is not required in "situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common

-7-

authority over the premises." <u>Illinois v. Rodriguez,</u> 110 S. Ct. 2793, 2797 (1990) (internal citations omitted). "Common authority . . . rests [] on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right." <u>United States v. Matlock,</u> 94 S. Ct. 988, 993 n.7 (1974). "The burden of establishing that common authority rests upon the State." <u>Rodriguez,</u> 110 S. Ct. at 2797.

### III. <u>Analysis</u>

Defendant argues that he has standing to challenge the search and that the search was unlawful. The government responds that Defendant lacks Fourth Amendment standing and that the FBI Agents had HPD's consent to enter the house and to conduct the search.

**A. Defendant's Standing to Challenge the Search**

Defendant argues that the Bertwood house is his home and that he therefore has Fourth Amendment standing to challenge the search. The preponderance of the evidence indicates that the Bertwood house is Defendant's home and that at the time of his arrest he frequently lived there, that he had a possessory interest, and that he was able to exclude others from entering. And based on Gould's testimony, it appears Defendant would continue living there if he is ever released from custody.

The Government emphasizes that Defendant is connected to multiple properties, that Eric Brown was listed as the owner and the one who paid the utilities, and that Defendant has not lived there since 2017. But the Government cites no authority that staying at or owning multiple properties negates Fourth Amendment standing, particularly in a defendant's primary residence. While legal ownership of a property is relevant, it is "neither the beginning nor the end of (the) inquiry." Salvucci, 100 S. Ct. at 2553. Here, Gould testified that the Bertwood house is considered the family's home and that Eric Brown and Defendant are the two who predominantly lived there.

Because Defendant has been in continuous custody since 2017, he has not been to the house in seven years. The Supreme Court in Mincey rejected the argument that a defendant's Fourth Amendment right in his house is lessened by being in custody. The search in Mincey differed from this case since it occurred soon after the defendant's arrest, but the court is not aware of opinions holding that longer periods of incarceration lessen a defendant's Fourth Amendment standing. Incarceration is an involuntary condition initiated by the Government. Defendant cites two civil cases holding that forcible changes in an individual's state of residency do not alter that person's domicile for purposes of the diversity jurisdiction statute. Preston v. Tenet Healthsystem Memorial Medical Center, Inc., 485 F.3d 804, 819 (5th Cir. 2007) (mandatory evacuation prompted by a natural disaster); Denlinger v. Brennan,

87 F.3d 214, 216 (7th Cir. 1996) (incarceration). Although relevant to a different inquiry, these cases are consistent with Mincey's reasoning. The court concludes that Defendant has standing to challenge the FBI's search of the Bertwood house on August 22, 2023.

**B.   The Legality of the Search**

Defendant argues that the search was warrantless and therefore unlawful. Because the FBI Agents did not obtain a warrant for the search, the Government must show that some exception to the warrant requirement applies. The only exception identified is the consent given by HPD Officer Watson who was on the scene investigating Eric Brown's death. HPD was authorized to enter the murder scene without a warrant to look for killers or victims, and HPD could seize evidence in plain view "during the course of their legitimate emergency activities." Mincey, 98 S. Ct. at 2413. But the Government's own account indicates that the FBI Agents did not enter to participate in HPD's sweep of the property but instead to search for evidence related to this case. To the extent HPD officers could permit other law enforcement to enter the scene, it did not have the authority to consent to a search that would have exceeded its own authority. Because the FBI Agents have not shown that they were conducting "legitimate emergency activities" when they seized the plain-view evidence, the seizure is not justified under an emergency exception. The FBI may have had sufficient

probable cause to obtain a warrant, but as the Court has made clear, this judgment must "be made in the first instance by a neutral magistrate." Id. at 2415.

### IV.  Conclusion and Order

Defendant has standing to challenge the FBI's search of the Bertwood house conducted on August 22, 2023. The search and seizure were conducted without a warrant, and no exception to the warrant requirement applies. Defendant Brown's Second Amended Motion to Suppress Warrantless Residence Search (Docket Entry No. 329) is therefore **GRANTED**.

**SIGNED** at Houston, Texas, on this 31st day of October, 2023.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE